United States v. Samuel Bankman-Fried Good morning, and may it please the Court. My name is Alexandra Shapiro, and I represent Sam Bankman-Fried on this appeal. Mr. Bankman-Fried's trial was fundamentally unfair because the jury only got to hear one side of the story, the prosecution's side, which was demonstrably false. In a series of evidentiary and procedural rulings, the district court deprived Mr. Bankman-Fried of the most basic principle of due process, the ability to rebut the government's case and present his defense to the jury. I'd like to focus my time today on two of our principal arguments, the Court's rulings on evidence relating to loss and the involvement of counsel. First, the government's principal theme at trial, which it repeated over and over again, was that customers and lenders had lost all their money and would never recover it. From the opening statement to the government's rebuttal, the prosecutors proclaimed that billions had been lost forever. This was false, but it was an extremely powerful story with moral force and undoubtedly had great impact on the jury's judgment. It was a play to what the Supreme Court and old chief called the human significance of what happened. The Court's asymmetric rulings allowed the prosecution to present this morally compelling tale, but prevented the defense from showing that the story wasn't true. The Court precluded- The government, for each of the counts charged in the indictment, from my reading of the record, had very substantial evidence of guilt. And you're saying that the inability of your ultimate loss proposition irreparably affected this trial? Yes, Your Honor. I mean, there was no meaningful quarrel with the composition of the jury. It may not have been a perfect trial, but I'm very interested in your contention as to why it wasn't fair. Well, Your Honor, there are two principal reasons. One relates to the evidence concerning loss. The other relates to the evidence concerning involvement of counsel. With respect to the loss issue, as I was starting to say, the government elicited a ton of evidence and made numerous arguments that billions had been lost forever. That was not true. And had counsel been able to introduce the evidence and cross-examined government witnesses accordingly, Mr. Bankman Freed would have presented the jury with a strong case that because this was a margin exchange and some of the investments he had made were highly valuable, even at the time of the bankruptcy and certainly at the time of the trial when the government was eliciting evidence from witnesses that they had lost their money forever and had never gotten it back, that would have been very important to supporting Mr. Bankman Freed's argument that he acted in good faith at the time. Did the Court allow Mr. Bankman Freed to argue or testify that he believed he was acting in good faith? The Court didn't block all of this. The Court, when it came to advice of counsel, allowed some testimony about having counsel available or work on retention policies and didn't allow it as to other aspects where Mr. Bankman Freed explicitly testified he didn't speak to counsel, get counsel's advice or permission. But he was allowed to testify about his state of mind, that he was acting in good faith. Well, two things, Your Honor. First, with respect to loss, he was allowed to testify generally as to his state of mind, but obviously not being able to corroborate that with more objective evidence was extremely prejudicial. Can I just jump in for a second? The corroboration of, I mean, you're saying that he was able to testify to his belief that the money wasn't lost or that there was solvency or what have you, and you're saying, well, there's objective evidence to corroborate that, but what you seem to be pointing to, at least in the briefs, is what came after. And so at the time when these actions were happening, there isn't, I mean, there's a right to present evidence as to his intent, absolutely, but I don't understand what you're saying about there's objective corroboration when the objective corroboration seems to be that, well, after the bankruptcy, in fact, more money was made. No, Your Honor. It's not limited to that. And for example, you can take a look at docket 407 at pages, I believe, 18 to 19, which lays out the fact that based on, as an example, filings by the bankruptcy trustee at the time of the bankruptcy, it's clear that there were very valuable assets in the estate that corroborated Mr. Bankman-Fried's view that the companies were solvent. But the misrepresentations were not to solvency, but liquidity. So I'm struggling with part of the government's theory of the case is that the defendant misrepresented to investors that their money was safe, was not being used. I'm sorry, Your Honor. That their money was not being used in the way that it was, the government claims and the jury convicted, was, in fact, used. So it wasn't an issue of solvency, right? It was an issue of liquidity, whether they could get their money if they asked for it. Well, Your Honor, I think there's a dispute, a factual dispute about whether there were misrepresentations and the government was taking a lot of things out of context. And this isn't, we're not making a sufficiency claim here. The issue is whether the government can prove beyond a reasonable doubt that these errors were harmless. And I do want to go back to the advice of counsel, because I didn't get a chance to address your question, Judge Kahn, on that. And the Court's ruling was extremely limited. The only piece the Court allowed was testimony related to the document retention policies, but Mr. Bankman-Freed was hamstrung in that, in regard to those  Now, he clearly told the Court he was affirmatively not relying on an advice of counsel defense in the, correct? No, yes and no. So a technical advice of counsel defense that might entitle one to the type of instruction discussed in Scully, yes, but he clearly was relying on the involvement of counsel as evidence of good faith. I haven't heard of a quasi-defense of counsel defense. You either rely on advice of counsel defense, or in this case, as I understood it, your client may not have advised counsel defense.  And the Court, in my reading of the district court opinion, went through the different types of charges, and whether Mr. Bankman-Freed had actually testified that he didn't ask counsel for advice on decision A and B. Your Honor, just to be clear, and I think the Scully case is very clear about this, as is the Howard case in D.C., a defendant is entitled to present a defense based on the involvement of lawyers, whether or not he is claiming to have specifically relied on their advice. That's very well settled. It's evidence of good faith, and he was entitled to present that. The judge rejected his ability to present evidence about, for example, the formation of the North Dimension entities and the bank account creation for those which the government claimed was the beginning of the counts in the indictment. It's relevant to the counts in the indictment, as is the other four categories that the judge precluded testimony about, because the government's claim in this case was that those entities were created so that, from the outset, the defendant could steal the customer's money. That was their government's claim. And so it was that. There was evidence about involvement of lawyers in the contract, the payment agent agreement between those entities and FTX, loans that the government claimed were shams, the terms of service, which were key points that Mr. Bankman Freed relied on because of the margin terms in Section 16, as well as the distinction between what could be used with respect to digital assets in 8.2 versus fiat, fiat deposits. And the judge excluded all of this. The fact that an attorney drafted a certificate of incorporation or drafted an agreement between two of the subsidiaries, help me understand how that is evidence relevant to any of the counts. Well, it's all relevant. And I don't think, I think you have to look at the whole picture and the cumulative picture. But this, you know, what happened here was the government claimed these entities were set up to take customer money so that the defendant could use it as he pleased. So the fact that lawyers were involved in creating the entities, lawyers were involved in drafting the contract whereby the funds were deposited in those bank accounts for the benefit of FTX customers, of course, that's all relevant to the defendant's good faith. And the real point here, though, is that, again, we're not making a sufficiency argument. And under the jury, the judge's reasoning in excluding it was essentially that he thought it wasn't true. And he thought that the jurors... I don't know if that's exactly a fair characterization. I think the question is, to the extent it has some relevance, it's always balanced against the potential prejudicial effect, not prejudicial effect in the sense of whether or not it's true, but prejudicial effect in the sense of the suggestion that, oh, the lawyers were involved, therefore everything that was, things that were going on were legal. But if the lawyers, in fact, were not aware of the withdrawals or the transfers or very specific actions that are related to the count, there's a fear that that could be misleading. And so I agree there's some relevance, but that's always, you know, it's always being balanced against, well, how probative is this evidence and what's the potential for prejudice? But that's exactly what this Court in Scully said is a balance that should be resolved in favor of the defendant, just as in Scully, because those are issues, the ones that Your Honor pointed to, that the government could cross-examine on and argue to the contrary. I mean, he didn't tell the lawyers all the facts, et cetera. I mean, the Court, this Court said in Scully, you know, there may be reasons to doubt the credibility and reliability of the defendant's testimony, and the government may well be correct that the documents proffered by the defendant were unlikely to sway a jury, but such even if his testimony is one-sided and self-serving and the Court reversed. Specifically did not advance an advice of counsel defense. If he advanced an advice of counsel defense, a lot of this stuff, I agree, would have been much more probative, but you gave that up and just, you had this vague, you know, there were attorneys out there somewhere, defense. But this Court was clear, and the D.C. Circuit's decision in Howard is crystal clear as well, that you don't have to have a formal advice of counsel defense, that this is all evidence related to good faith, and coupled with the inability to Hiring a lawyer is evidence of good faith? Having a lawyer involved in the transaction. Look, in the Scully case, the government maintained. What you told the lawyer, whether you told the lawyer everything, and then what the lawyer told you, the fact that, you know, you may have signed a retainer agreement and, you know. But I think, Your Honor, respectfully, the point of the Scully decision is that these are issues for the jury to weigh. They're not to be taken away from the jury. The defendant is entitled to present these arguments to the jury. A formal advice of counsel case? Wasn't that a formal advice of counsel defense that was raised in Scully? Isn't that correct? It was, although the issue in Scully involved a situation in which the government argued that, as to certain particular transactions, that the lawyer actually hadn't provided any advice. And nonetheless, this Court reversed and granted a new trial. But part of the reason of the... And the Court didn't distinguish between a formal advice of counsel and the idea that it's evidence of good faith. If you think lawyers are involved in things like drafting the terms of service, which were a key piece of Mr. Bankman Freed's defense... Right. But part of the reason why the formality matters is because, in that instance, then there's an obligation on the defendant to say, and the lawyers were aware of all the relevant factors. Isn't that part of what is involved when you're talking about a formal advice of counsel defense? And so here, where there isn't testimony or there isn't an assertion that, yeah, the lawyers knew about everything that was going on. They knew about the transactions. They knew about this, that, and the other. Therefore, I should be able to testify that, yeah, lawyers were present. And that's, I think, the difference in the formal defense and sort of what you're arguing, which is more just a general sort of good faith, having lawyers be involved in the thing.   whether it's in the case itself, suggests that it wasn't this, you know, preplanned nefarious thing that the government is suggesting. Well, I think the problem with this discussion, in my view, is that it's all evidence of good faith. And again, you know, it's up to the jury to decide, and he never got to... The fact that I hired a lawyer and had the lawyer prepare some documents, how is that evidence of good faith? It's evidence of good faith because, again, I'm repeating myself, but if you just, you could go through each of these things. So there are loans to the defendant and some of the other executives. The government claims, you know, that those loans were improper. If lawyers were involved in the loans, one could certainly say, you know, I believe that because lawyers were involved, that was part of the reasons I thought these loans were improper. But how is the court supposed to assess that defense against the testimony that the court heard and found with regard to the defense theory of the relevance of attorney's involvement in drafting certain agreements? The court said what was fatally undermined by the defendant's own admission that he had not discussed the charged conduct, permitting Alameda to take vast sums of FTX customer deposits with counsel. So throughout each of the charged, each claim as to lawyers were involved in this and lawyers were involved in that, the court heard testimony from Mr. Bankman Freed that, in fact, he had not discussed, had not sought counsel's advice, had not shared the information with counsel, and had not, and counsel wasn't aware of the conduct. So how is it, you know, it's one thing to say it's good faith. It's another when the defendant himself under oath says, I didn't discuss this with the lawyers. I didn't share this conduct with the lawyers. They weren't aware of it. Well, that's not, respectfully, I don't think that's a fair characterization of the testimony at the preview hearing in the first place. For instance, as to some of it, Mr. Bankman Freed was, did believe that lawyers were involved because he was told by other, another executive. So, and he didn't say that as to each of the four categories. I don't think that's a fair. He didn't say just to retention, right? So the court allowed testimony. No, I'm talking about the four categories that he excluded. I know, but I'm now asking you a question about, there were instances where the court allowed it, where there was testimony that counsel had been involved and was aware, like in retention policies, and that your client's testimony relied on that. Well, the court said it was going to allow that. That testimony was actually curtailed during the testimony before the jury. But the other point, and I know Your Honors haven't asked about this, but the preview hearing itself was completely unprecedented and would set a terrible precedent if permitted. There was an ample disclosure, which isn't required by the rules, in the first place. And, but most importantly, the point of all of this is. You had the preview hearing involving the testimony about advice of counsel? The deposition, yes. But you didn't object to it. No, that is not correct, Your Honor. So there's a whole history to this. It needs to be. So the. Where's the objection? There are, in our reply brief, as we explain, and let me just first, I'll give you the appendix sites in a moment, but what happened here was, first, a disclosure was demanded. The defense objected twice to the disclosure. That's at pages A554 and 569. And then, under duress, having been forced to provide a disclosure, they provided a single-space, seven-page disclosure. And then the Court announced that wasn't enough, and it clearly would have been futile to lodge further objections. The Court, for example, made clear that he was going to insist on the hearing at page A880. And then during the hearing, again, the Court said, quote, if you want to push ahead with the evidence you're seeking to introduce, it's through this hearing, if at all. And that's at page A969.  But the problem that Kaplan faced was he was as confused as we are about whether you were, whether or not this was going to be an advice of counsel defense. And if it wasn't going to be an advice of counsel defense, what was it going to be? Well, Your Honor, again, I think the point here, and the decision in Scully, the decision in Howard, make clear that this is evidence of good faith. It was up to the jury. You know, it's not that hard for the jury, if a person is cross-examined, to decide, well, is this valid, or, you know, is the defendant not telling the truth? Is he telling the truth? Are you seriously suggesting to us that if your client had been able to testify about the role that attorneys played in creating these various documents, the not-guilties would have rolled in on this record? Your Honor, what – first of all, it's their burden to prove harmless error. I understand that. But what we are submitting, and, you know, is that this, together with the asymmetrical rulings on loss, certainly at a minimum, cumulatively would have affected the outcome. Mr. Bankman Freed never got to present the jury with his full defense. His – And the – I want to be – I'm sorry. I apologize for repeatedly cutting you off. But the asymmetrical rulings on loss, this – you're adverting to the fact that testimony came in from government witnesses that they had never been made whole? They were never – that they were never made whole. There was – it was numerous government witnesses testified to – and the government argued that they were never going to – that the money was gone forever, that it was never going to be recouped, that thousands lost billions. This was repeated. Are we talking about testimony or are we talking about closing arguments? Everything. So we're talking about the evidence that came in and the way the government used it in its opening and its closing. This was a case which was presented to the jury as a situation in which thousands had lost billions of dollars, never to be regained. And having chosen to try the case that way, the defendant was entitled to respond. He was entitled to demonstrate that this was a solvency – a liquidity crisis, not a solvency crisis, that he had believed in good faith that the assets were there. With respect to the counsel issue – So you do – you agree that he was trying to argue this was a solvency issue, that he didn't have a solvency issue. He simply had a limited liquidity issue. At the end, that the customers could have been repaid had there been sufficient time, and there is – How do you square that with, for example, the recent Supreme Court decision and, you know, other decisions cited in the recent Supreme Court decision that the fact that victims might be hold or intended to be defrauded is not a proper defense? I assume Your Honor is talking about coupsicis? Coupsicis. Is that how to pronounce it correctly? I believe so. So two points, Your Honor. First of all, again, we're not making a sufficiency argument. The point is that having chosen to try the case as one of essentially permanent deprivation, he was entitled to respond to that. That type of argument has tremendous moral force, number one. Number two, coupsicis merely says that it's not a required element of male – If you're not making a sufficiency argument, then do you concede that there was sufficient evidence to convict on the counts of conviction? Because there's a disconnect there. There's no disconnect, Your Honor, with respect. No. We have never made – Well, let me answer my question. If you're not challenging sufficiency of the evidence, do you concede then that the government presented sufficient evidence under the current state of law to prove conviction? The evidence was sufficient, but that's not part of the appeal. The issue on appeal is –  I get that you're not challenging a sufficiency of the evidence. But if you concede that the evidence was nonetheless sufficient, then where's the harm? Well, that makes – Your Honor, it's very well settled that the sufficiency standard is incredibly high and almost impossible to meet on appeal. But the argument here is about whether these errors were harmless beyond a reasonable doubt, because our contention – Don't we look at the sufficiency of the evidence when we look at whether there's harm, that errors are harmful? The fact that the evidence is sufficient certainly doesn't mean that the errors were harmless beyond a reasonable doubt. If that were the case, this Court would never reverse convictions for evidentiary errors, and it does so from time to time. I've had numerous cases where this Court has reversed Scully as an example of that. There's no sufficiency argument there. The case was reversed because the error was harmless, and it's their burden to prove the error is harmless beyond a reasonable doubt, whereas sufficiency is based on the notion that, you know, all inferences have to be weighed in favor of the government. It's the opposite on harmless error. That's not how this works. And so the point here is that the trial was unfair. It's not about whether the evidence was sufficient. We don't know – you know, the point is the trial was unfair, and we don't know whether the jury would have reached the same verdict had Mr. Bankman-Fried been allowed to fully present his defense. This was a high-profile trial, both sides represented by able counsel. There was the usual, you know, back and forth and aggressive, up-to-the-line advocacy. You won some things. You lost some things. And help me – I mean, it almost seems at times that you're spending more ink on Judge Kaplan than you are on the merits. I don't agree at all, Your Honor, and respectfully, I don't think it's a fair assessment of the record below to say that trial counsel won some things and lost some things. The defense was cut off at the knees by the judge's rulings. And I – and it's clear, particularly from the loss ruling and the asymmetry of that, I think we pointed to certain comments and the judge's demeanor as observed by objective observers because we are arguing that if a new trial is granted – Are you referring to the newspaper reporters? Yes, but that's just related to the argument that if a new trial is granted, it should be assigned to a different judge. But the broader point is that I think any objective observer reading this record can see that the rulings are incredibly one-sided. I think there's – you'd be hard-pressed to point to any significant ruling that the defense won, quite frankly. But the bigger point is that on these two evidentiary issues, they created a very severe asymmetry that prevented Mr. Bankman Freed from effectively presenting his defense to the jury that he acted in good faith, that this was a margin exchange, that everyone would have understood that the assets could be loaned out, and that he did not intend to steal anyone's money. And that would have been a defense to which of the counts? All of the counts, Your Honor. Before you sit down, let me get your view on the $11 billion forfeiture. Sure, Your Honor. Did you have a specific question or – I think we have several arguments for why. What's the best one? I think they're all great, Your Honor. I think there's – The briefs are well-written. There are statutory arguments that a money judgment is improper, as well as that the statute on which the government relied for the portion of the forfeiture related to the investors and the lenders does not apply because, you know, this is not an illegal – these were not illegal transactions. It's an argument that legal transactions – and then, most importantly, we have an Eighth Amendment argument given the – I just wanted to be sure, I suppose, that there was nothing you wanted to – no points you wanted to make that weren't – No, Your Honor. I think the briefs lay out our position on that clearly. Thank you. All right. Thank you. We've got some rebuttal. May it please the Court, Nathan Wren for the United States on this appeal, and I represented the United States at trial. At that trial, the overwhelming evidence proved that Sam Bankman Freed committed a large-scale fraud on the customers of FTX, the cryptocurrency exchange that he ran. He told his customers FTX was a safe place where their money would be held in custody for them, but instead he misappropriated billions of dollars of customer deposits by funneling it into his trading company, Alameda. Despite his explicit assurances to his customers, to the public, to his investors, and even to his own employees, that money was not being held safely at FTX. What was at FTX was a deficiency of more than $8 billion because the money had been moved to Alameda, where Bankman Freed had spent it on investments, political donations, and other expenditures. None of the claims that Bankman Freed raises on appeal provide any basis to overturn the conviction in this case, especially in light of the overwhelming evidence that was presented at trial. And several of the arguments that we've heard, both in the briefing and this morning, are based on a mischaracterization or a framing of what happened at trial that really is not supported by the record. So I want to focus first on the issue of evidence as to loss. And I think it's important, really, to focus on the actual holdings that Judge Kaplan made that are being challenged in this appeal. Because if you look at what Judge Kaplan precluded, it was very clear that he was precluding evidence as to the present-day value of certain investments that Bankman Freed had directed to be made with customer money. And as this Court has affirmed for decades, evidence about the potential ultimate recovery to victims or a defendant's belief as the potential ultimate recovery of victims simply is not a defense to fraud. That's in the Molle's case. That's in Lange. Does it matter, this issue that was raised regarding asymmetry and having witnesses testify the money's gone? To this day, I've still not gotten it back with the sort of info in the background that actually it's maybe not forever. And, in fact, most of the victims are going to get some, maybe all of the money back. I think that's your adversary was describing an asymmetry in the sense of the government, as she's portraying you, is saying this money is gone forever with the knowledge that actually that may not be the case. So there was no asymmetry because neither side presented any evidence about what the ultimate outcome of the bankruptcy might be. The evidence was focused on— Not so much on the bankruptcy, but just the government portrayed this case as there are all these victims, they've lost this money, and it's gone forever. So the government didn't make the argument that the money was gone forever. The government's arguments were focused on the crisis that consumed FTX in 2022, when, in fact, the money had been misappropriated, when customers were seeking to make the withdrawals that they had been assured by FTX they would be able to make and that would be available to them, and they weren't able to do so. And if you look at the actual parts of the transcript that the defendant focuses on, that's exactly the argument that the government was making. So, for example, the rebuttal argument at pages A, 1110, and 1111 of the appendix, where the government presented the case to the jury that the defendant was looking at a balance sheet that, true, showed a net asset value of positive for Alameda, i.e., it technically had long-term assets in excess of its liabilities, but it had nowhere near enough money to cover customer withdrawals. And the reason that was important was because as those customers testified and as multiple other witnesses, such as Alameda and FTX employees testified, the customers had been told the money was being custodied for them, that it was safe, that it would be available to be withdrawn on demand. And there was – and, in fact, the customers were specifically asked at trial about this theory that the defense is now putting forward, both they put forward at trial and they're putting forward at appeal, that, oh, it's all going to come out in the wash because we put your money in good investments. And so the first customer who testified about being unable to withdraw, at transcript pages 81 and 82 of the trial transcript, he was asked, well, did you agree that FTX would borrow your funds and make investments with them and you could be paid back out of those investments? And he specifically testified, no, that's not what I signed up for. So the idea that this use of customer funds for investments wasn't presented to the jury is simply inaccurate. The second customer said the same thing at trial transcript 1289 and 90. He was asked, did you understand that your money might be invested? Did you agree that it would be lent out? No, I didn't agree to that. That's not a risk I was willing to take. So you're saying the government's theory was never that this money is gone forever or that, you know, I understand the government's theory that money was stolen because it was taken without permission.  And used for a purpose without permission. But did the government argue that this money was gone forever? No, there was no mystery about what had happened to the money. There were days of detailed financial tracing testimony describing how the FTX customer funds had been drained into these investments. My question is, did the government argue that this money was gone forever and these victims would never recover any money? No, that was not what the government argued at the trial. That's exactly what you asked, Juilliard. This is 1070, or 686. You said, as we sit here today, have you been ever able to withdraw your FTX customer deposits that we see? The answer was never. That's correct, Your Honor, and that was in the context of his testimony that when he had deposited his funds on FTX, he had been under the understanding from the representations that Bankman Freed had made and the representations that the company had made at his direction that the money was being held in custody and available for him to withdraw from the exchange. And as I just referenced, he was also asked, well, did you agree that the money would be borrowed and would be put into investments? And he said, no, I didn't agree to that. So it wasn't relevant that ultimately down the line the investments might pay out and he might be able to get some recovery later because he was specifically asked about what was his understanding, what was the basis, the representation on which he was induced to part with his money. And that representation was, FTX will custody this money for you and it's available for you to withdraw on demand. He put $100,000 plus into FTX and he was given a document that said, you now have three Bitcoin. That was false. No Bitcoin were ever purchased for him. That money went directly to Alameda where it was spent on these investments in direct contravention of what the customers were told. And that issue was extensively litigated at trial with both sides looking carefully at the representations that customers were given and whether what was actually done with the money was consistent with those representations. And again, this court has held for decades and the Supreme Court has recently made it even more clear in the Kousisis case that questions about the ultimate losses to victims of a fraud are not properly before a jury at trial. The question is whether the victims were fraudulently induced to part with money or property. And that is what the jury was presented with in this case and that's what the evidence overwhelmingly supported. Can you address the forfeiture issue? Certainly, Your Honor. With respect to this question of whether it's appropriate for the court to enter a money judgment, the defendant's arguments are simply foreclosed by circuit precedent. So in the Awad case, this court has held that a money judgment is appropriate under the forfeiture statutes. I know there are currently some cases on appeal relating to the issue of whether money judgments are unconstitutional in terms of their amount under the Eighth Amendment. What's your position on that? I mean, the level here is pretty high compared to some of those cases where we're talking 30 million. Yes, Your Honor. So there are factors that the court should consider in evaluating whether a forfeiture order is in excess of the Eighth Amendment's bar on excessive fines. But the primary issue are you're comparing the size of the forfeiture to the size of the defendant's crime. And if you look at the factors that this court has applied, it considers things like, what would be the maximum fine that Congress would have allowed for this conduct? What was the loss to the victims of the crime? And how does that compare to the forfeiture money judgment? And here, because of the enormity of the defendant's crimes, you do end up with a very large forfeiture award. But that's calibrated to the enormity of the defendant's conduct, to the fact that he defrauded so many people of so much money that the forfeiture order reflects that. Well, what legitimate penal purpose do you think does the government believe a forfeiture of that amount serves? Your Honor, a forfeiture that allows the recovery of the full amount of misappropriated or fraudulently obtained funds is an important tool in preventing defendants from profiting from their offense conduct. Well, suppose every single one, just hypothetically, once the lawyers that you use have spent more and more time investigating this and finding out funds to make everybody whole, at that point, what legitimate penal purpose does an $11 billion forfeiture serve? So what's not allowed under the forfeiture statutes and what's not authorized by this forfeiture judgment is a double recovery. And so the defense suggested in their opening brief that there wouldn't be offsets against the forfeiture for specifically recovered properties that were obtained in the course of the forfeiture proceedings. But, in fact, the forfeiture judgment specifically says those are offset against the forfeiture. But that's a different question. I mean, the fact that there are property, this property that's been seized and I guess its value is to be determined and that will be deducted from the $11 billion, which I think is what you're describing, is a different question than what Judge Parker was getting at, which is if one of the factors we consider is harm to the victims and if it is going to possibly be in this case that all of the victims are going to be made whole, how do you still get to justifying this $11 billion number? So in this case in particular, as was explained to Judge Kaplan, the Department of Justice is using forfeited funds for remission to victims. And so part of that recovery to victims that the defense is talking about is the fact that those forfeited funds are going to those victims. So again, the way this was set up and structured in this case was specifically to make sure that those forfeited funds would be used to make victims whole. And to the extent that, you know, again, there won't be a double recovery here because the total amount of losses to victims exceeds the amount... It's not about double recovery. I guess I'm not thinking right now about double recovery to the victims. I'm just talking about to the extent that part of the reason why a number is what it is is because of the victims. To the extent that there is recovery by the victims, does that mean the number should be shorter, not be lower, not because we're concerned about double recovery, but just because to the extent that's one of the factors, maybe that means the $11 billion number is the right one. So, Your Honor, there has been some recovery of victim losses through the bankruptcy proceedings, and there's also been a large amount of recovery through forfeiture actions over the course of this case. And those forfeiture actions are being administered through a remission process that's working alongside the bankruptcy to get that money out to FTX victims. So there isn't a situation where somehow the defendant is going to have to pay more than what victims ultimately may recover. So if the victims are made whole, will he still have a forfeiture obligation? Your Honor, the... In the event that total victim losses were covered, that would take care of the forfeiture obligation in the way that the remission process has been structured in this case, yes. So if the victims are made whole, the forfeiture goes away. Is that what you're telling us? If the amount that the forfeiture judgment has been satisfied to make victims whole, then that would satisfy the forfeiture judgment based on the remission authorization that's been made in this case. I'm sorry. I don't understand that answer. So my understanding, and I haven't studied the remission order in this case, is that the remission authorization that the Department of Justice has put in place is to take forfeited funds and pay them out to victims up to the amount of forfeiture that's been authorized in the case. And so that will satisfy both the forfeiture judgment and the victim. In actuality, we're not going to get close to what these numbers are. But in the event that there was sufficient recovery... Right, but does that... And I guess perhaps I'm not understanding the point you're making either. Let's say... So there's an $11 billion forfeiture order. Let's say, at some point, $4 billion of it ends up going to the victims, but the victims are otherwise made whole. So the victims are made whole, and $4 billion of that has come from this forfeiture order. He's still going to be responsible for the other $7 billion, correct? So the forfeiture order would still be in effect. I mean, as a practical matter, the odds of recovery of those billions of dollars, I think, are unlikely. But in practical effect... Right, but that's part of the issue, not having a forfeiture order that's going to be so... This is an important issue to us. Do you have to please stop bobbing and weaving on it? Your Honor, the forfeiture judgment was based on the losses to victim customers, victim lenders, and victim investors. This Court's precedents establish that that is an appropriate basis for the entry of a forfeiture award, which is what the district court did in this case. Now, this Court's precedents also establish that it's permissible for forfeiture to not be duplicative of restitution. In other words, they're separate obligations on a defendant. And the reason for that is because the mere paying back the victims is not sufficient penal... It's not a sufficient incentive for a defendant not to commit fraud if it's simply paying back the victims. There's an additional financial penalty represented by the forfeiture award. However, in practice, and especially in large victim loss cases, the Department of Justice has the authorization to use forfeited funds for remission to victims. And in this case, that's what the Department of Justice has done and is doing with the forfeited funds. So when we hear this about the recovery to the victims in the bankruptcy, a substantial portion of that recovery is due to the forfeitures that took place as a result of this criminal case. So if the forfeiture award were to go away, those forfeited funds wouldn't necessarily be available for the bankruptcy to distribute them to FTX customers. Charles, one of the investments that Bank and Freed made in, you know, Coinbase or Binance, turned out to be highly profitable and netted $10 billion. So that unexpected recovery by the government, on the government's behalf, was able to make all the investors whole. I want to just be sure I understand, what effect would that have on the $11 billion? Certainly, Your Honor. So the residual claimants in the bankruptcy are the investors in FTX. And they come ahead of the insider shareholders like Bank and Freed. And so they would, I think, to the extent there was excessive recovery in the bankruptcy, they would be the ones entitled to any residual claims. But I do want to highlight one important aspect of this, which is the customer bankruptcy claims are linked to the dollar value of their crypto balances on FTX at the time of the bankruptcy. So when we talk about 100% customer recovery, it's tied to that amount. But if you're a customer, like Mark Julliard, who testified at the trial, he thought he had three Bitcoin. Three Bitcoin are now worth about eight times what the value of those three Bitcoin were in November of 2022. So those victims aren't being close to being made whole in the bankruptcy. And in the sort of realistic economic sense, they're being made whole as a percentage of the dollar value of their Bitcoin balances as of November 2022. The reason that's important is the FTX estate has said, to the extent there is excess recovery, the first priority is to make those customers whole relative to what the value of their crypto would be. Because that's what they were told was happening with their money. That's the truly just result here. And so that's, I think, why it's essentially almost impossible to imagine that there would ever be an excess recovery because the customers who were told that Bank Manfred was purchasing crypto for them, that wasn't happening. And that crypto has since appreciated in value. So the actual losses to customers are much higher. And you're suggesting then that if there is a recovery of the $11 billion in the forfeiture order, that those customers would be the first to, that the way the forfeiture is structured, they would have the first right to recover in whatever funds are forfeited in the future? Forget what's already attached. So the way the Department of Justice's remission or agreement has been structured is to pay out claims through the bankruptcy according to the respective loss amounts of the different groups of victims, lenders, investors, and customers. My understanding, and this is getting a little bit beyond my expertise with respect to how the bankruptcy is structured, but my understanding is that the debtor estate in the bankruptcy has said, to the extent there's additional increased recoveries, the priority will be on making customers whole in the true economic sense, that is, what the current value of their crypto would be, as opposed to the sense of what the November 2022 dollar value of the coin would be. But eventually the bankruptcy will end. The bankruptcy proceedings, they can take a long time, but eventually they will end, whereas the forfeiture order doesn't end, correct? It will carry on through the ascendance. Until satisfied, correct. So potentially there could be a situation where the bankruptcy process has ended and there's a recovery somehow down the road. That would then be, there would be no mechanism in effect to make the victims whole, if you will, in terms of what they expected to earn, as opposed to what their assets were valued at in bankruptcy court. Is that what you're saying? The currently existing mechanism would no longer be in effect, but the Department of Justice always has the ability, when it forfeits funds, to accept victim claims. But does it have the ability or the willingness? I guess that's the key, isn't it? It is the willingness, Your Honor. The typical practice in my experience has been, even though the department is not obligated to use forfeited funds to pay victims of fraud, that is the overwhelmingly majority of cases they choose to do that. So in the unlikely event that there were some funds that had been squirreled away and hidden from both the bankruptcy and the government that were discovered at some point in the distant future, we would submit that the appropriate thing to do would be for those forfeited funds to be used for any remaining victims who haven't yet been made whole, rather than somehow saying the forfeiture should go away and they should go back to the defendant, who by that implication would have profited from his ability to hide fraudulently obtained funds for an extended period of time. So the structure of the forfeiture award is appropriate to ensure both that money is available for victims to be made whole and also to prevent defendants from being able to conceal the proceeds of fraud past the time at which other procedures might be in place to make victims whole. Just remind me. I think you covered it in the brief, but I want to be sure I understand this. So what is the source? The forfeiture award points to which assets? Money that the defendant has taken out of the company or money that the trustee happens to recover or both? So the forfeiture award is directed at the fraudulently obtained customer funds. So the biggest component of it is FTX. You could take a $30 million house in the Bahamas and you could also take the 10 Bitcoins that you belatedly discovered in a desk in his office. Yes, Your Honor. To the extent that the funds are traceable to FTX customer deposits that were improperly funneled into other uses, and these efforts are ongoing. The bankruptcy estate has been engaged in efforts. The government has also been engaged in efforts to identify those assets and recover them for the sake of victims. But it comes from that initial fraudulent misappropriation and the tracing of those wrongfully obtained customer deposits to some other place where they were ultimately put, whether it was an investment or real estate or some other source. Your adversary says in effect that Judge Kaplan gave you nearly unlimited flexibility in arguing that there were investors that would never be made whole and suffered losses and in effect gave you a walk around from his ruling, which you exploited. Can you give me the government's position on that? So with respect to the issue of losses in particular, Your Honor? Yes. So the only issue that was contested was this issue of the degree to which the fact that FTX and Alameda declared bankruptcy could be admitted into evidence. And the government argued that that was important because it established that there was, in fact, a deficiency in FTX's assets that made it unable to provide for customer withdrawals as it had represented to customers that it would be able to do. And that evidence was also inextricably part of the evidence at trial because the sort of revelation of the fraud essentially coincided with the declaration of bankruptcy. But there wasn't evidence about this issue we were talking about earlier. Long-term, would customers be made whole or not out of the recoveries from the investments and the like? The only thing that the defense has pointed to are those two questions that were asked of customers. Have you been able to withdraw your funds from FTX? First off, those questions weren't objected to during the trial. And second off, as I explained, in context, those customers were also asked about, well, would you have agreed that your deposits could be lent out? Was it your understanding that was a possible outcome? Neither of those customers had agreed to participate in this margin program, which the defendant made a significant deal out of at trial. And both of them testified they didn't agree to that. That wasn't a risk they were willing to take. And so the fact that they expected their money had been used to purchase crypto, that it was sitting in an account in FTX available for them to withdraw, and that that representation hadn't been complied with, was the fraud. That was the misappropriation. And no court has ever suggested that a defense to a fraud like that is, oh, well, don't worry, I put your money in an investment, and down the road, you're going to get it back. You're not going to have an ultimate loss. And so that was really the focus of the government's arguments at trial and the focus of the evidence. And it was really those particular questions. Have you, sitting here today, have you been able to withdraw? That's the context in which those questions were asked. Again, they weren't objected to. It wasn't an attempt to litigate the degree to which the portfolio of investments at Alameda was or was not going to be profitable in the end. That simply wasn't something that was at trial, and it wasn't something that was appropriate to be at trial. Before I sit down, if I could just briefly address the advice of counsel issue, because I think just one point that's important is that the description of the Scully case that we heard from defense counsel simply can't be squared with what Scully says. In Scully, the defendant had proffered adequate evidence to support an advice of counsel defense. And so this Court held that a district court's concerns about the credibility of that testimony weren't a basis to preclude it because it was a sufficient proffer for the defense. And, in fact, footnote 5 at page 477 of Scully makes that clear. Advice of counsel is not for the jury's consideration at all, absent some evidence of the required facts. Whether that burden is met is thus, in the first instance, for the court to decide. So the court has an appropriate role in determining whether the defendant's burden of production is adequate to make out the elements of advice of counsel. The district court appropriately discharged that role. The defendant didn't testify that he relied on the advice of counsel with respect to the issues he was testifying about. And so it was appropriate for the court to preclude that under Rule 403 as not being relevant to any issue for the jury to consider. Unless there's any other questions. Just one last question. Your adversary has contended that Judge Kaplan was uniformly biased in your favor. What's your response to that? So two responses. First off, I don't think that's really a fair characterization of the trial. There were a number of times where Judge Kaplan cut off government examinations, where he sustained defense objections to government questions. His rulings were even-handed, and he appropriately sustained or overruled objections from both sides throughout the trial. But secondly, it's not a counting game, you know, where, oh, each side gets 50 objections sustained, and if that doesn't happen, there's been some departure. Many of the arguments that the defense has made on the evidentiary record on this appeal, as we've just been through, are meritless. And so the court appropriately ruled against the defense on those. And the fact that there weren't similarly meritless arguments being made by the government doesn't suggest somehow that the court was biased. And ultimately, the ultimate analysis here is even if there had been any error, and we submit there wasn't for the reasons we've outlined, this is a case, if ever there was one, where any error would be harmless beyond a reasonable doubt. There were four people who knew about the misappropriation of customer deposits. Three of them testified that they conspired with Sam Bankman Freed to do that fraudulently. Everybody else testified that they had no idea because they had relied on Sam Bankman Freed's representations that that wasn't what was happening inside of FTX. And there was abundant documentary evidence to support that, in addition to that overwhelming witness testimony. So the suggestion that any of these errors might have led to a different result at this trial simply can't be sustained on this record. Thank you very much. I'd just like to make a few points. First of all, my adversary said that the government never argued to the jury that the money was gone forever. That is demonstrably false. Starting with Mr. Wren's own opening, this is at Trial Transcript, page 37, in which he said, the customers were left with billions of dollars in losses and his investors and lenders were left with nothing. Another example, at page A1096, in the closing. Investors lost all their money, and it's very straightforward. At page A1105, thousands of people lost billions of dollars. Everyday people lost savings. That's also in the closing. And then finally, just another example. Again, there are many more. They're cited in our brief at Trial Transcript, page 2912. Their money was gone. FTX was bankrupt. Billions of dollars from thousands of people was gone. And that was based on a lot of evidence in the trial, including not only the two customers who testified, and Your Honor, Judge Parker covered some of that with my adversary, but in addition, there was similar testimony from a lender. There was similar testimony from other government witnesses. The picture the government painted overwhelmingly was a false one, that the money was gone forever. Secondly, there was some back and forth. Sorry. And the main issue here is the one of asymmetry. That is really the point here. So the government could have tried a case that was essentially, well, there was a temporary loss, a temporary inability to use the money because of the liquidity problem. That wasn't the case they tried. It wasn't nearly, wouldn't have been nearly as persuasive. Are you taking any objection to Judge Kaplan's charge on the loss issue? As to mail and wire fraud, we agree that Coussous changes the law of this circuit. Okay. How about the other two? But I do want to make clear two other things. First, my adversary told Your Honors that Coussous holds that loss is not relevant. That is not true. What Coussous holds is what the element is. And loss or lack of loss is always relevant in a fraud case. It's relevant, for instance, to motive. And clearly, when the government puts in evidence on one side of the ledger and claims there's actual loss of billions of dollars, as a matter of due process, the defendant should be entitled to rebut that. In addition, you know, we also had a jury instruction argument about the willfulness that goes to two of the counts. That is totally unaffected by Coussous's. With respect to the advice of counsel, just one point. I think my adversary has mischaracterized the Scully case. The part of the Scully case he's citing to relates to whether a defendant is entitled to an affirmative instruction on advice of counsel. That's not the argument here. The argument is about the admission of the evidence. And the rest of the Scully case that addresses that supports our argument and shows that Judge Kaplan and the government are wrong. With regard to the forfeiture, I just want to make two quick points. One is that if you take a look at the forfeiture order, you'll see that regardless of what the government is saying about this so-called remission agreement, the judgment itself would, you know, is still going to be in effect unless the court overturns it. And that is an $11 billion liability for Mr. Bankman Freed. And for all the reasons in our briefs, it's an illegal forfeiture order. But I also want to point out that the current situation, as I understand it, is that 98 percent of all the creditors in the bankruptcy have received 120 percent of the value of the monies, and that includes interest. So they have received interest. And that after paying out $8 billion and $1 billion in legal fees, the estate still has $8 billion left over to cover about $2 billion more claims. So it would be inappropriate to have this illegal forfeiture order hanging out there just with some view that somehow it's necessary to repay victims. Just in conclusion, if I may, the collapse of FTX affected many people and indeed an entire industry, and it was a tragedy. In these circumstances, the easiest course may seem to be to overlook how the trial was conducted and find a way to label the errors harmless. But that would be a grave mistake. The public interest in ensuring that criminal trials are fair is at its height in a high-profile case like this one. And Mr. Bankman Freed should have been allowed to tell his story and to counter the government's false tale of lost billions with the truth. The jury should have had the full picture, and without that, neither the court nor the public can have confidence in the verdict. And yet Mr. Bankman Freed sits in prison serving a 25-year sentence. His conviction should be vacated. Thank you. All right. Thank you. Thank you both. We appreciate your presentations. Difficult case, but well-briefed and well-argued. Thank you. All right. Thank you all. So that's the last case on our calendar for argument.